IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| BURLAP AND BARREL, INC.; COLLECTIVE HOROLOGY LLC;<br><br>Plaintiffs,<br><br>v.<br><br>JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;*<br><br>Defendants. | Case No. 26-03345<br><br><br>**Complaint** |

1.   This action challenges tariffs imposed on imported merchandise from 60 economies[1] under Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411. The Office of the United States Trade Representative announced those tariffs in its *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Relating to the Failure of Each Economy to Impose and Effectively*

---

[1] USTR describes the tariffs as covering 60 "economies." That figure comprises 57 sovereign countries, Taiwan, Hong Kong, and the European Union, which the USTR treats as a single economy. Because the EU has 27 Member States, the action in practical terms reaches imports from at least 84 sovereign countries, in addition to Taiwan and Hong Kong. The phrase "60 economies" thus substantially understates the tariffs' geographic scope.

1

*Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (July 23, 2026)[2] (the "Section 301 Action"). The challenged tariffs impose ad valorem duties of generally 10 or 12.5 percent on merchandise from the covered economies, collectively accounting for approximately 99.4 percent of all imports into the United States,[3] purportedly in response to the alleged failure of those economies to impose and enforce adequate prohibitions on the importation of goods made with forced labor.

2.   This Court has recently considered similar assertions of unilateral executive branch tariff authority by these Defendants. Last year, a three-judge panel of this Court found that the President's claimed authority to impose unilateral and unlimited tariffs at his personal discretion exceeded any possible authority under the International Emergency Economic Powers Act (IEEPA). Ultimately, the Supreme Court agreed, invalidating the President's IEEPA tariff regime. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

3.   The Administration immediately imposed replacement tariffs under Section 122 of the Trade Act of 1974—which this Court has also held unlawful. That decision is currently on appeal in the United States Court of Appeals for the Federal Circuit. *State of Oregon v. United States*, Nos. 26-01472-3JP, 26-01606-3JP, 2026

---

[2] https://ustr.gov/sites/default/files/files/Press/Releases/2026/FLIP%20301%20Investigation%20Final%20Action%20FRN%207-23-26%20FINAL.pdf

[3] *Fact Sheet: USTR Section 301 Action in Response to the Failure of 60 Economies to Ban Imports Produced with Forced Labor*, available at https://ustr.gov/about/policy-offices/press-office/fact-sheets/2026/july/fact-sheet-ustr-section-301-action-response-failure-60-economies-ban-imports-produced-forced-labor

Ct. Intl. Trade LEXIS 57 (Ct. Int'l Trade May 7, 2026), appeal docketed, No. 26-1804 (Fed. Cir. May 8, 2026).

4. The Section 122 tariffs are limited by statute to 150 days. The Administration used that period to conduct the Section 301 investigations at issue here and then imposed the challenged Section 301 tariffs. The sequence and structure of those measures, as well as Administration statements, show that the Section 301 Action was designed to preserve substantially the same broad tariff regime that this Court and the Supreme Court have held Congress did not authorize under IEEPA and Section 122.

5. The Section 301 Action exceeds the authority Congress granted in Section 301. Section 301 is a targeted, country-specific and practice-specific remedial authority. It permits the Trade Representative to act only upon a determination that a particular act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, 19 U.S.C. § 2411(b)(1), and any responsive action must be directed to that act, policy, or practice, 19 U.S.C. § 2411(b)(2). It is not a freestanding authorization to tax substantially all imports from substantially all trading partners at rates selected to replicate the invalidated IEEPA tariff regime rather than to eliminate identified foreign practices.

6. The Section 301 Action is also arbitrary and capricious: USTR failed to provide a reasoned, record-based explanation for its determinations or for its

selection of near-uniform duties across 60 economies with materially different enforcement records and trade profiles.

7. And if Section 301 were construed to authorize duties of this scope across substantially all imports from substantially all trading partners, at rates selected in advance and without a sufficient connection to the statutory determination and remedial purpose, that construction would constitute an unconstitutional delegation of Congress's core Article I tariff power.

8. The Court should therefore set aside and enjoin the Section 301 Action.

## Jurisdiction and Venue

9. The Court has subject matter jurisdiction under 28 U.S.C. § 1581, because this action arises out of laws of the United States providing for tariffs and revenue from imports, and out of the administration and enforcement of those laws. 28 U.S.C. § 1581(i)(1)(B), (D).

10. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

11. The challenged determinations and directives constitute final agency action. Plaintiffs have no other adequate remedy in a court. This Court may review the

4

action under 28 U.S.C. § 2640(e) and set it aside to the extent it is arbitrary, capricious, contrary to law, or in excess of statutory authority. *See* 5 U.S.C. §§ 702, 704, 706(2)(A), (C).

## Parties

12. Plaintiff Burlap and Barrel, Inc. ("Burlap & Barrel") is a mission-driven, New York-based business that sources unique spices and other ingredients that are grown naturally and sustainably using traditional techniques and brings those flavors to dinner tables around the country. It places a significant emphasis on the quality of its spices, working carefully with local farmers to cultivate and import the highest quality products. It imports single-origin spices from 22 countries: Afghanistan, Argentina, Barbados, Canada, Colombia, Costa Rica, Ethiopia, France, Grenada, Guatemala, Hungary, India, Indonesia, Mexico, Nepal, Nigeria, Peru, Spain, Sri Lanka, Tanzania, Turkey, and Vietnam.

13. Plaintiff Collective Horology LLC ("Collective") is a Ventura, California-based small business focused on independent and high-end mechanical watches. It is an authorized retailer for independent watch brands, including individual artisans and small workshops in Switzerland, the United Kingdom, France, Austria, Denmark, the Netherlands, and the United States.

14. Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

15. Defendant Office of the United States Trade Representative ("USTR") is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

16. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

17. Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative. It is headquartered in Washington, D.C.

18. Defendant United States of America is the federal government of the United States of America.

19. Defendant United States Customs and Border Protection ("CBP") is a federal agency, and a component of the Department of Homeland Security, responsible for, *inter alia*, securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

20. Defendant Rodney S. Scott is the Commissioner of CBP. He is sued in his official capacity.

## Facts

21. The Constitution vests all legislative Powers in Congress, beginning with the foundational "Power To lay and collect Taxes" and "Duties." U.S. Const. art. I, § 8, cl. 1. Because the President possesses no independent authority to impose tariffs, he may do so only when exercising specific, limited power delegated by Congress under

strictly defined conditions. *See generally Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

**The Prior Executive Actions**

22. On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 2, 2025) (the "Liberation Day Order").[4] That Order imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10 percent tariff on nearly every country in the world, regardless of whether that country imposes tariffs on United States products, the rates at which it does so, or the existence of any trade agreements governing the relationship.

23. In addition to the global 10 percent tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the Administration claimed to be an estimate of "tariff and nontariff barriers," but which ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country—not an accepted methodology for calculating trade barriers.

24. As a statutory basis, the Liberation Day Order, and the subsequent orders modifying that tariff regime, cited the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 *et seq.* ("IEEPA"); the National Emergencies Act, 50

---

[4] https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/

U.S.C. § 1601 *et seq.*; Section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301.

25. On February 20, 2026, the United States Supreme Court held that the Liberation Day tariffs were *ultra vires*, because IEEPA does not grant the President tariff authority. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026). "The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope," the Supreme Court explained. "In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it." *Id.* at 646.

26. The same day, the President, in a press conference and in posts on social media, objected to the Supreme Court's decision, and announced that he would be issuing new replacement tariffs under other statutory authorities. That same day, the U.S. Trade Representative explained that, despite the Supreme Court decision, the Administration would "continue implementing the President's trade policy" including by "[i]mmediately imposing a temporary 10 percent surcharge" pursuant to Section 122 and by initiating "several investigations under Section 301."[5]

27. Later that day, the President issued Proclamation 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems*, 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation").[6]

---

[5] https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision

[6] https://www.whitehouse.gov/presidential-actions/2026/02/imposing-a-temporary-import-surcharge-to-address-fundamental-international-payments-problems/

28. The President imposed, based on claimed authority in Section 122, a surcharge of ten percent on goods imported into the United States—the same amount as the baseline global reciprocal tariff rate imposed under the original Liberation Day Order—subject to various exemptions and carve-outs, for 150 days, the maximum duration allowed by Section 122 without congressional approval.

29. This Court found those Section 122 tariffs *ultra vires*—a decision currently on appeal in the Federal Circuit. *See State of Oregon v. United States,* Nos. 26-01472-3JP, 26-01606-3JP, 2026 Ct. Intl. Trade LEXIS 57 (Ct. Int'l Trade May 7, 2026), appeal docketed, No. 26-1804 (Fed. Cir. May 8, 2026).

**Section 301 of the Trade Act of 1974**

30. Title III of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, codified as amended at 19 U.S.C. §§ 2411–2420, establishes a statutory framework governing United States trade action in response to specified acts, policies, or practices of foreign countries. Section 301 distinguishes between mandatory action under Section 301(a) and discretionary action under Section 301(b), and prescribes procedures for investigations, consultations, determinations, public participation, implementation, monitoring, and modification of actions.

31. Section 301(a) requires action where the Trade Representative determines that (1) the rights of the United States under a trade agreement are being denied; or (2) a foreign country's act, policy, or practice violates or is inconsistent with the provisions of, or otherwise denies benefits to the United States under, a trade agreement, or is unjustifiable and burdens or restricts United States commerce. 19

U.S.C. § 2411(a). When those conditions are met, USTR generally must take action, subject to the limitations and exceptions prescribed by the statute. 19 U.S.C. § 2411(a)(1)–(2).

32. Section 301(b) authorizes discretionary action only where the Trade Representative determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce," and that action is appropriate. 19 U.S.C. § 2411(b). Both elements—the characterization of the specific practice and the determination that the specific practice burdens or restricts United States commerce—are prerequisites to discretionary action under Section 301(b).

33. Any action taken under Section 301(b) is subject to statutory conditions: the Trade Representative may act "subject to the specific direction, if any, of the President," and "shall take all appropriate and feasible action authorized under [Section 301(c)] . . . to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2). The remedy must therefore be tethered to, and directed at eliminating, the specific act, policy, or practice found actionable.

34. Sections 302 through 304 of the Trade Act prescribe mandatory procedures, including initiation of an investigation, a request for consultations with the foreign country concerned, publication of proposed action and the findings on which that action is based, opportunity for public comment and hearing, and determinations within statutory timeframes. 19 U.S.C. §§ 2412–2414. Section 306 requires monitoring of the implementation of actions taken, or agreements entered into, by a

10

foreign country to provide satisfactory resolution of a matter subject to investigation, 19 U.S.C. § 2416, and Section 307 governs modification and termination of actions, 19 U.S.C. § 2417.

35. USTR may act under Section 301(b) when a foreign act, policy, or practice is "unreasonable or discriminatory and burdens or restricts United States commerce." "Unreasonable" is defined in § 2411(d)(3) to include practices that are "unfair and inequitable" even if not in violation of any international obligation. The statute enumerates examples including denial of worker rights, export targeting, and market access barriers. 19 U.S.C. § 2411(d)(3)(B).

36. Section 304(a)(2)(B) generally requires the Trade Representative to make determinations within 12 months of initiating a non-trade-agreement investigation—reflecting Congress's expectation of deliberate, evidence-based, country-specific inquiry, not a preordained result announced within weeks. 19 U.S.C. § 2414(a)(2)(B).

**The Section 301 Action**

37. On March 12, 2026, USTR formally initiated Section 301 investigations on an unprecedented scale, including (a) an investigation into "structural excess capacity and production in manufacturing sectors" concerning sixteen economies accounting for more than 75 percent of United States imports, and (b) an investigation concerning approximately 60 economies "Relating to Failures to Take Action on

11

Forced Labor" (the "Forced Labor Investigation"), covering nearly all United States imports.[7]

38. On June 2, 2026, USTR determined[8] that certain acts, policies, and practices of each of the 60 investigated economies relating to the failure to impose or effectively enforce prohibitions on the importation of goods made with forced labor were unreasonable and burdened or restricted U.S. commerce. USTR published notice of those determinations and proposed responsive tariffs on June 5, 2026. 91 Fed. Reg. 34272. USTR made those determinations concerning 60 economies in less than three months after initiating the investigations, compared to the more than seven months that USTR took in 2017 and 2018 to complete its single investigation into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation.[9]

39. USTR provided a public comment period ending July 6, 2026, and held a public hearing from July 7 to July 9, 2026—less than five weeks after publication of the proposed action, which covers substantially all United States imports.

40. USTR issued its final determinations on July 23, 2026, approximately 133 days after initiating the investigation. The duties apply to covered merchandise "entered for consumption, or withdrawn from warehouse for consumption, on or

---

[7] https://www.federalregister.gov/documents/2026/06/05/2026-11296/notice-of-determinations-and-request-for-comments-concerning-actions-in-section-301-investigations

[8] https://ustr.gov/about/policy-offices/press-office/press-releases/2026/june/ustr-makes-findings-and-proposes-action-60-section-301-investigations-relating-failures-take-action

[9] https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF

after 12:01 a.m. eastern time on July 24, 2026, except that goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern time on July 24, 2026, and entered for consumption or withdrawn from warehouse for consumption before 12:01 a.m. eastern time on July 28, 2026, shall not be subject to such additional duty." Section 301 Action at 2.

41. USTR's final notice confirms that the President directed the operative features of the Section 301 Action. After receiving USTR's recommendations, the President directed USTR to impose tariffs of 10 percent or 12.5 percent on goods from the investigated economies, subject to specified exemptions, and to establish textile tariff-rate quotas for certain imports from Bangladesh, Cambodia, Indonesia, and Malaysia. Section 301 Action at 8–11. USTR then implemented the directed tariff rates and related measures "in accordance with the specific direction of the President." *Id.* at 11–14.

42. The rates imposed by the Section 301 Action closely track the rate structure previously imposed or negotiated under the invalidated IEEPA program, including its 10 percent baseline tariff and additional country-specific rates. *See* 90 Fed. Reg. 15041, 15045 & Annex I. Even where the Section 301 Action's rates are below the invalidated IEEPA tariff rates, USTR is simultaneously conducting separate Section 301 investigations concerning structural excess capacity and production in manufacturing sectors in sixteen of the same economies, which could result in additional, layered duties and bring aggregate rates closer to the original IEEPA levels. *See Initiation of Section 301 Investigations: Acts, Policies, and Practices of*

13

*Certain Economies Relating to Structural Excess Capacity and Production in Manufacturing Sectors*, 91 Fed. Reg. 12886 (Mar. 17, 2026).

43. Treasury Secretary Scott Bessent has insisted that these new policies will result in "virtually unchanged tariff revenue"[10] following the Supreme Court's IEEPA ruling and the impending expiration of the Section 122 surcharge, claiming that "the tariff rates are going to go back to exactly where they were" and projecting that "there's going to be a de minimis decline in tariff revenue" in 2026 under the new Section 301 tariffs.[11] Those statements, in combination with the timing, scope, and rate structure of the final action, support the inference that the Section 301 tariffs, *by design*, replace the invalidated global tariff regime rather than constitute measures selected to obtain elimination of identified economy-specific practices.

44. USTR determined the tariff rates first—calibrated to replicate the invalidated IEEPA rates—and assembled economy-specific findings afterward to justify them. The Action's coverage likewise tracks the value of U.S. imports rather than any explained distinction in the forced-labor-import practices of covered and noncovered economies: USTR selected 60 economies collectively accounting for approximately 99.4 percent of U.S. imports by value, without explaining why trade volume bears on whether an economy's alleged practices warrant tariffs or whether those tariffs would eliminate those practices. USTR's report contains no meaningful country-by-country analysis of how each investigated economy's forced-labor import-

[10] https://www.c-span.org/clip/public-affairs-event/treasury-secretary-says-2026-tariff-revenue-will-remain-virtually-unchanged-after-supreme-court-ruling/5193748
[11] https://pressroom.versantmedia.com/cnbc/press-releases/cnbc-transcript-us-treasury-secretary-scott-bessent-speaks-cnbcs-joe-kernen-1

14

prohibition regime and enforcement practices burden or restrict United States commerce, and no explanation of how near-uniform duties of 10 to 12.5 percent on economies with vastly different enforcement records constitute action responsive to each economy's specific practices.

45. The Section 301 Action's justification for the action is that forced labor creates artificial cost advantages, and that countries that prohibit forced labor domestically, but do not effectively prevent imports of forced-labor goods, allow those goods and inputs to compete in their markets. 91 Fed. Reg. at 34273–74; *see also* Section 301 Action at 3, 6–7. USTR further asserts that this circumstance harms U.S. producers competing in both U.S. and foreign markets and displaces goods produced without forced labor or forced-labor inputs. *Id.*

46. The Section 301 Action imposes a 10 percent duty on products of 17 economies; for merchandise from the European Union and Taiwan, a Section 301 duty calibrated so that the combined ordinary customs duty—referred to as the "most-favored-nation" duty—and Section 301 duty equal 10 percent; for merchandise from Japan, Korea, and Switzerland, a Section 301 duty calibrated so that those combined duties equal 12.5 percent; and a 12.5 percent duty on products of the remaining covered economies. Section 301 Action at 9–14. The Section 301 Action contains product exclusions set forth in Annexes I and II and directs USTR to establish, when feasible, tariff-rate quotas for specified textile and apparel imports from Bangladesh, Cambodia, Indonesia, and Malaysia. *Id.*

47. According to USTR, the failure to adopt and enforce an import prohibition on forced-labor goods is unreasonable and burdens U.S. commerce because it (1) undermines the universal aim of ending forced labor; (2) permits firms using forced labor to produce more cheaply and distort market conditions; (3) undermines the profitability of firms not using forced labor; and (4) contributes to circumvention of existing forced-labor import prohibitions. 91 Fed. Reg. at 34274; *see also* Section 301 Action at 3, 6–7.

48. But the purported rationale of addressing forced labor is simply a pretext for tariffs. The Section 301 Action preserves the basic architecture of the IEEPA and Section 122 tariff actions: broad duties imposed across nearly all imports, subject to categorical exclusions intended to avoid supply disruptions and other economic harms, as well as selected economy-specific carve-outs—exclusions that are substantially the same categories of products from the prior IEEPA and Section 122 tariff actions. Compare Section 301 Action at 4–5, 8–10, 13–14 & Annexes I–II, with Liberation Day Order, 90 Fed. Reg. 15041, and Section 122 Proclamation, 91 Fed. Reg. 9339.

49. USTR did not engage in a reasoned, record-based analysis explaining how the particular act, policy, or practice identified for each investigated economy—as distinct from the global existence of forced labor, international trade in goods produced with forced labor, or foreign trade generally—burdens or restricts United States commerce within the meaning of 19 U.S.C. § 2411(b)(1). While the report contains some economy-by-economy discussion of the existence or enforcement of

16

forced-labor import prohibitions, it does not explain how each economy's particular practices burden or restrict United States commerce, rather than relying on generalized assertions regarding the effects of forced labor and forced-labor inputs in global supply chains.

50. The duty structure imposed by USTR bears no reasoned or explained relationship to the widely varying enforcement records, legal regimes, or trade profiles of the covered economies. USTR did not adequately explain why those classifications justified the particular rates selected, or why the application of a single rate to materially different economies within each category was appropriate and feasible to eliminate each economy's identified practices. Nor did USTR adequately explain how either rate would eliminate the specific practice identified in each investigation.

51. USTR's findings contain no reasoned, record-based explanation of how duties on substantially all merchandise from each covered economy—including merchandise that USTR did not identify as connected to forced labor—constitute "appropriate and feasible action . . . to obtain the elimination of" the specific practices found actionable. 19 U.S.C. § 2411(b)(2); *see also* Section 301 Action at 1, 7–14. Although USTR identified categories of excluded products and asserted that the selected rates and exclusions would be appropriate and feasible, it did not explain why the duties it selected, at the rates it selected, were appropriate and feasible to eliminate the practices it identified rather than broad measures designed principally to raise revenue from imports generally.

17

52. The Section 301 tariffs also were imposed following a process that did not permit meaningful consideration of the factual, legal, and remedial issues presented by investigations of 60 separate economies. USTR offered a single comment period and a single three-day hearing on its proposed responsive action for determinations concerning 60 economies with materially different legal regimes, enforcement practices, commercial relationships with the United States, and trade profiles. The final tariff action followed 133 days after initiation and took effect the next day. The abbreviated process, the scope of the action, and the resulting record demonstrate that USTR did not genuinely consider the economy-specific questions its final action purported to resolve.

**The Harm to Plaintiffs**

53. Burlap & Barrel is a New York-based spice company with a mission that includes ending exploitation in global food supply chains by connecting smallholder farmers directly to high-end markets, helping those farmers generate a larger share of the product's value, and establishing long-term, mutually beneficial partnerships with suppliers. By sourcing its spices directly from small-scale farmers around the world, Burlap & Barrel eliminates unnecessary middlemen and uses those savings to pay farmers anywhere from two to ten times more than what they otherwise receive for their products.

54. Burlap & Barrel is deeply opposed to the use of forced labor and sources its own spices only from small suppliers who adhere to key labor standards.

55. Burlap & Barrel imports from 22 countries: Afghanistan, Argentina, Barbados, Canada, Colombia, Costa Rica, Ethiopia, France, Grenada, Guatemala, Hungary, India, Indonesia, Mexico, Nepal, Nigeria, Peru, Spain, Sri Lanka, Tanzania, Turkey, and Vietnam.

56. Some of the spices Burlap & Barrel imports that are not grown domestically—such as cinnamon, black peppercorns, and vanilla—are exempt from the tariffs under product-specific exclusions identified in the Section 301 Action's Annexes. *See* Section 301 Action at 8–10, 13–14 & Annexes I–II. However, tariffs still apply to other imported spices for which no domestic substitute exists. Burlap & Barrel imports unique international varieties of spices that are unavailable from domestic producers, such as garlic powder from Vietnam and Guatemala, chilies from Turkey, sea salt from Tanzania, and Herbes de Provence from France. Because these specific varieties cannot be sourced domestically, Burlap & Barrel cannot avoid the tariffs by switching to U.S.-grown alternatives.

57. Since the imposition of the 2025 IEEPA tariffs, unlike many other businesses that have passed that cost on to consumers, Burlap & Barrel has refrained from passing on that cost to its customers, absorbing the costs itself. But the Section 301 tariffs will force Burlap & Barrel to raise prices on the spices it imports.

58. As a result of the tariffs, Burlap & Barrel has decided to pause spending on innovation, like developing new products or creating new partnerships with restaurants and celebrity chefs, and other special projects.

59. Burlap & Barrel currently has five shipments scheduled to arrive in the next few weeks on which it will have to pay tariffs imposed by the Section 301 Action. These imports are valued at approximately $124,407. The expected tariff for the imports is approximately $13,888. Burlap & Barrel will pay these tariffs upon the shipments' arrival at the Port of New York and New Jersey, as well as the Port of Baltimore, Maryland. For so long as the Section 301 tariffs remain in effect, Burlap & Barrel estimates that it will continue to pay tariffs at a comparable or greater rate.

60. The IEEPA and Section 122 tariffs have already harmed Burlap & Barrel's business through lost profits, higher prices, cash flow issues, supply chain uncertainty, and lost customers, partners, and contracts. Burlap & Barrel will now be required to pay the newly imposed Section 301 tariffs, which will continue those harms while the Section 301 tariffs remain in effect.

61. Plaintiff Collective is a Ventura, California-based small business that introduces American collectors to independent watchmakers whose work is rarely found in traditional retail stores. Since its founding in 2018, Collective has represented approximately 20 independent watch brands, including individual artisans and small workshops in Switzerland, the United Kingdom, France, Austria, Denmark, and the Netherlands. Collective serves those makers by providing online and in-person retail, original content, personal customer service, and events, and serves American consumers by identifying and making accessible

watches that reflect the design, technical knowledge, and craftsmanship of particular makers.

62. Collective is deeply committed to the values of independent craftsmanship and ethical commerce and deeply opposed to the use of forced labor. It works almost exclusively with founders, designers, and craftspeople—not conventional wholesale intermediaries—and selects the brands it represents based on the quality and distinctiveness of their work, not their commercial popularity.

63. The watches Collective imports are not interchangeable mass-produced products. Each reflects the specialized design, technical expertise, and craft traditions of a particular maker, often produced in small workshops by artisans whose skills, equipment, suppliers, and traditions are inseparable from the places where the watches are made. Many of Collective's brand partners produce only a limited number of watches each year. Collective cannot avoid the Section 301 tariffs by substituting domestically produced goods: the independent watchmakers it represents cannot simply relocate their operations or recreate their work in the United States, and no domestic substitute exists for the particular watches Collective imports.

64. When a watch enters the United States, Collective must pay the tariff before it can sell the watch and recover that expense. For a small American retailer importing highly specialized products with limited capital reserves and without the scale or negotiating leverage of a multinational luxury conglomerate, an additional duty of 10 or 12.5 percent has an immediate and substantial impact.

65. Collective currently has three shipments scheduled to arrive in the coming weeks on which it will be required to pay duties imposed by the Section 301 Action. These imports are valued at approximately $69,000. The expected tariff on those imports is approximately $8,280. Collective will pay these tariffs upon the shipments' arrival. For so long as the Section 301 tariffs remain in effect, Collective estimates that it will continue to pay tariffs at a comparable or greater rate.

66. The Section 301 tariffs require Collective either to absorb the additional cost—reducing the resources available to operate and grow its business—or to pass some portion of that cost on to American consumers through higher prices. Either outcome harms Collective: absorbing the duties reduces its margins and available capital, while raising prices reduces demand and makes the independent watches it offers less accessible to American collectors. The tariffs also complicate Collective's decisions about inventory, pricing, creating jobs and hiring talent, new brand partnerships, and future collaborative watch projects, impairing its ability to plan and invest in its business.

67. The IEEPA and Section 122 tariffs have already harmed Collective's business through increased import costs, reduced margins, disrupted purchasing and inventory planning, and reduced ability to invest in new partnerships and collaborative projects. Collective will now be required to pay the newly imposed Section 301 tariffs, which will continue those harms while the Section 301 tariffs remain in effect.

68. The impact on Plaintiffs, as well as countless other American businesses, of the President's unilateral, worldwide tariffs initially and unlawfully imposed using IEEPA, then also unlawfully under Section 122, and now again unlawfully under Section 301, is severe and will continue to harm Plaintiffs with unnecessary additional costs.

## Class Allegations

69. Plaintiffs bring this action on behalf of themselves and, under USCIT Rule 23, on behalf of a class defined as: importers of record that have paid, or will be required to pay, duties imposed under the Section 301 Action on merchandise entered for consumption, or withdrawn from warehouse for consumption, in the United States on or after July 24, 2026 (the "Class").

70. The Class is so numerous that joinder of all members is impracticable. The Section 301 tariffs cover merchandise from approximately 60 economies accounting for approximately 99 percent of all United States imports, and the Class accordingly includes many thousands of importers of record nationwide.

71. There are questions of law and fact common to the Class, including whether Section 301 authorizes the challenged tariffs; whether the Section 301 Action complied with the procedural and substantive requirements of 19 U.S.C. §§ 2411–2414; and whether, if Section 301 were read to authorize the challenged tariffs, it would constitute an unconstitutional delegation of legislative power. These questions are capable of classwide resolution because their answers turn on the

23

validity of a nationwide agency action and do not depend on the circumstances of any individual Class member.

72. Plaintiffs' claims are typical of the claims of the Class: like all Class members, Plaintiffs will pay unlawful duties imposed under the same agency action, and their claims arise from the same course of conduct and legal theories. Plaintiffs seek the same declaratory and injunctive relief as the Class.

73. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to those of other Class members and have retained counsel experienced in constitutional and trade litigation, including counsel who litigated challenges to the IEEPA and Section 122 tariff actions.

74. Defendants have acted and continue to act on grounds generally applicable to the Class by imposing and administering duties pursuant to the Section 301 Action, so that final injunctive and declaratory relief is appropriate respecting the Class as a whole. The requested return of duties unlawfully collected is equitable restitution incidental to vacatur of the Section 301 Action and the requested classwide injunction. Accordingly, certification under USCIT Rule 23(b)(2) is appropriate.

75. In the alternative, common questions of law and fact predominate over questions affecting only individual Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. See USCIT Rule 23(b)(3). The central issues concern the lawfulness of the Section 301 Action. Individual Class members' interests in separately litigating those issues are

limited, while adjudicating them in one action in this Court promotes consistent resolution and avoids unnecessary, duplicative litigation.

76. Plaintiffs' counsel is competent and qualified to represent the Class. Plaintiffs' attorneys have experience litigating complex constitutional and international-trade matters, including challenges to the IEEPA and Section 122 tariff actions; are well versed in the legal and factual issues presented here; and will fairly and adequately represent the interests of the Class.

## Count I

### The Section 301 Action exceeds the authority granted by Section 301 of the Trade Act of 1974.

77. The preceding paragraphs are incorporated herein by reference.

78. Under Section 301(b), USTR may take action only where it determines that an "act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce," and that action is appropriate. 19 U.S.C. § 2411(b)(1).

79. Even where those predicates are satisfied, Section 301(b) authorizes action only to obtain "the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2). Section 301 is therefore a targeted trade-remedy statute, not an unrestricted delegation of authority to establish general tariffs.

80. The Section 301 Action exceeded those statutory limits. It imposes additional ad valorem duties on substantially all merchandise from approximately 60 economies based on USTR's conclusion that those countries have failed to adequately prevent the importation into their own territories of goods containing

25

inputs produced with forced labor. The Section 301 Action exceeds the authority Congress conferred because Defendants did not validly determine that, with respect to each economy, a specific foreign act, policy, or practice is unreasonable or discriminatory and burdens or restricts U.S. commerce.

81. Section 301 does not permit USTR to substitute a generalized assertion that forced labor is harmful, unfair, or economically distortive worldwide for the statute's required determination concerning an identified foreign act, policy, or practice and its burden or restriction on United States commerce.

82. Defendants instead rely on a generalized theory that an economy's asserted failure to prohibit or effectively prevent the importation of goods produced wholly or in part with forced labor permits such goods and inputs to compete in global supply chains at artificially reduced costs, thereby burdening United States commerce.

83. Nothing in Section 301 authorizes USTR to impose duties on that basis without a demonstrated, country-specific burden or restriction on United States commerce resulting from the challenged foreign practice.

84. The statute's broad definition of "unreasonable" does not eliminate Section 301(b)'s independent requirement that the identified foreign act, policy, or practice burden or restrict United States commerce. Nor does it authorize Defendants to treat every perceived inadequacy in another country's regulation of imports as an actionable Section 301 practice warranting countrywide tariffs.

85. Any responsive action must be "to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2). Defendants did not explain how near-uniform ad

26

valorem duties of 10 to 12.5 percent on substantially all merchandise from approximately 60 economies—duties calibrated to restore the rate structure and preserve substantially the same tariff revenue from the invalidated IEEPA tariffs and expired Section 122 tariffs and imposed without regard to the distinct circumstances of each economy—are designed to eliminate any identified foreign practice. Instead, the Section 301 Action imposes a general import tax that Section 301 does not authorize.

86. Defendants' interpretation of Section 301 also presents a question of vast economic and political significance. Under Defendants' asserted construction, USTR may impose broad and potentially indefinite tariffs on extensive categories of imports from numerous countries whenever it determines that those countries have not adopted regulatory measures it considers adequate to address a global policy concern. Section 301 contains no clear statement authorizing USTR to impose broad countrywide import duties as a means of compelling foreign governments to adopt the regulatory structures that the Executive Branch desires. The major questions doctrine and the canon of constitutional avoidance require Section 301 to be construed not to authorize the sweeping power Defendants claim. *See West Virginia v. EPA*, 597 U.S. 697, 716 (2022); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

87. Section 301 should be construed in accordance with its text, structure, and remedial function: as authorizing action directed to eliminating an identified foreign

act, policy, or practice that USTR has determined is unreasonable or discriminatory and burdens or restricts United States commerce.

88. The Section 301 tariffs directly and irreparably harm Plaintiffs and the Class, who face increased costs for the goods they sell, reduced demand resulting from higher prices, and disrupted supply chains, among other threats to their livelihoods.

## Count II
### The Section 301 Action is arbitrary, capricious, and contrary to law.

89. The preceding paragraphs are incorporated herein by reference.

90. This claim is asserted against Defendants Greer, USTR, CBP, and Scott.

91. The Administrative Procedure Act requires a reviewing court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92. An agency must examine the relevant data, consider the important aspects of the problem, articulate a satisfactory explanation for its action, and establish a rational connection between the facts found and the choices made. An agency may not rely on conclusory assertions, disregard important evidence, fail to consider obvious and significant alternatives, or offer an explanation that is contrary to the record or pretextual.

93. The Section 301 Action is arbitrary and capricious because USTR failed to provide a reasoned explanation, grounded in the administrative record, for its

28

determinations that the alleged acts, policies, or practices of each subject economy burden or restrict United States commerce.

94. USTR relied on generalized assertions regarding the economic harms associated with forced labor and goods made with forced-labor inputs in global supply chains. But USTR did not adequately explain how the alleged inadequacy of each particular subject economy's controls over imports containing forced-labor goods causes a concrete burden or restriction on United States commerce.

95. A generalized conclusion that forced labor distorts global commerce does not rationally support the imposition of broad tariffs on a particular economy's products without an explanation of that economy's particular role in causing a burden or restriction on United States commerce.

96. The Section 301 Action is arbitrary and capricious because USTR failed to provide a reasoned explanation for its selection of near-uniform duties of 10 and 12.5 percent on substantially all merchandise from approximately 60 economies. USTR did not explain why those rates, those covered products, and that exceptional breadth were appropriate and feasible means of obtaining the elimination of the particular acts, policies, or practices identified in the Section 301 Action.

97. USTR failed to consider the obvious alternative of less sweeping measures, including measures directed to particular goods, industries, supply chains, or trade channels identified in the record. USTR's failure to meaningfully consider these alternatives was arbitrary and capricious, particularly where the Section 301 Action imposes duties on imports irrespective of any connection to forced labor.

98. The Section 301 Action is also arbitrary and capricious because USTR selected the challenged tariff rates to replace or replicate revenue from the invalidated IEEPA tariff regime, rather than based on a reasoned assessment of what action was appropriate and feasible to eliminate the practices identified in the investigation. The Section 301 Action's selection of economies accounting for approximately 99.4 percent of U.S. imports by value, without a reasoned explanation connecting that trade-volume-based scope to the alleged foreign practices or the statutory remedial objective, supports that conclusion. The Section 301 Action's stated rationale is therefore inconsistent with, and pretextual in light of, the record and the agency's actual basis for decision.

99. The Section 301 tariffs directly and irreparably harm Plaintiffs and the Class, who face increased costs for the goods they sell, reduced demand resulting from higher prices, and disrupted supply chains, among other threats to their livelihoods.

## Count III

### If Section 301 authorizes the challenged tariffs, it violates the nondelegation doctrine.

100. The preceding paragraphs are incorporated herein by reference.

101. The nondelegation doctrine requires Congress to supply an intelligible principle that meaningfully guides and constrains the exercise of delegated authority. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 472–76 (2001).

102.    Section 301, properly construed, contains constraints that preserve its constitutionality. It authorizes action only in response to an identified foreign act, policy, or practice that is unreasonable or discriminatory, burdens or restricts United States commerce, and is subject to action "to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2411(b)(2).

103.    Those limits define Section 301 as a targeted trade-remedy statute. They do not authorize a general delegation to impose countrywide tariffs as a means of advancing any policy objectives the Executive Branch considers desirable.

104.    Defendants' asserted construction of Section 301 eliminates those limiting principles. Under that construction, USTR, acting at the President's direction, may impose duties at rates and with coverages of effectively unlimited scope on broad categories of imports from numerous trading partners based on a determination that their regulation of a global policy concern is inadequate.

105.    If Section 301 were construed to permit the Trade Representative, at the President's direction, to impose duties of any amount on substantially all imports from substantially all trading partners—without a meaningful requirement that the action be directed to eliminating identified foreign practices that burden or restrict United States commerce—then Section 301 would supply no intelligible principle constraining the exercise of Congress's power to lay duties.

106.    Such a construction would convert a targeted remedial statute into an effectively unrestricted delegation of Congress's tariff power. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*,

31

293 U.S. 388 (1935); *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting).

107.    Section 301 should be construed to avoid that serious constitutional question. But if Section 301 authorizes the challenged tariffs notwithstanding those statutory constraints, then Section 301, so construed, is an unconstitutional delegation of legislative power. The Section 301 Action must therefore be set aside.

108.    The Section 301 tariffs directly and irreparably harm Plaintiffs and the Class, who face increased costs for the goods they sell, reduced demand resulting from higher prices, and disrupted supply chains, among other threats to their livelihoods.

## Prayer for Relief

WHEREFORE, Plaintiffs on behalf of themselves and the Class respectfully request that the Court grant the following relief:

a.  Certify the proposed Class under USCIT Rule 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

b.  Declare that Section 301 of the Trade Act of 1974 does not authorize the Section 301 Action;

c.  Declare that the Section 301 Action and the tariffs imposed thereunder are arbitrary, capricious, in excess of statutory authority, and contrary to law, and set aside the Section 301 Action;

d.  Declare that, if Section 301 is construed to authorize the Section 301 Action, it is an unconstitutional delegation of legislative power;

32

e.  Enjoin Defendants from enforcing or collecting duties imposed under the Section 301 Action, including through liquidation of entries subject to those duties;

f.  Order Defendants to refund to Plaintiffs and the Class all duties unlawfully collected under the Section 301 Action, together with interest as provided by law;

g.  Award Plaintiffs and the Class their attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

h.  Grant other relief that the Court may deem just or proper.

Dated: July 24, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, DC 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org